CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
JAN 19 2021
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )   | |
| ) | Case No. 4:19-CR-00039 |
| v. ) | |
| ) | By:   Hon. Michael F. Urbanski |
| JUAN RAMIREZ-SOLIS, ) | Chief United States District Judge |
| Defendant. ) | |

**MEMORANDUM OPINION**

Law enforcement officers held defendant Juan Ramirez-Solis and his passenger, a pregnant woman, on the side of the road for an extended period of time for reasons unrelated to the traffic stop, instead suspecting that he was lying about his inability to speak English and was somehow connected to a Mexican drug cartel. While the officers initially had lawful grounds for stopping Ramirez-Solis for a window tint violation, they did not have constitutional authority to neglect those investigations and extend the traffic stop to interrogate him about his English and fish for a connection to drug activity. Indeed, the officers did not even check the window tint on the vehicle for nearly an hour. The officers' lengthy extension of the traffic stop violated Ramirez-Solis's constitutional right to be free from unreasonable seizures. As such, the court will **GRANT** his motion to suppress the evidence obtained during the search of the vehicle and any statements made after the stop was unconstitutionally prolonged.

I.

On July 19, 2019, Ramirez-Solis was driving down West Main Street in Danville, Virginia, when Officer Ian Smith of the Danville Police Department ("DPD") and Trooper William Wooding of the Virginia State Police, pulled him over because the tint on the vehicle's

windows appeared unlawfully dark. Both officers were wearing body cameras and their vehicle was equipped with a dashboard camera.[1]

Officer Smith approached the vehicle and asked Ramirez-Solis for his driver's license. The passenger, Leslie Reyes-Martell, told Officer Smith that he didn't have one. BWC-X81200433 at T23:27:45Z. Officer Smith asked Reyes-Martell what the driver's name was and, after she translated the question, he replied "José Ramirez." Id. at T23:27:51. Trooper Wooding also approached and asked Officer Smith if Ramirez-Solis could speak English. Dash Cam at 02:00. Officer Smith said Ramirez-Solis "claims he doesn't." Id. Neither Officer Smith nor Trooper Wooding had reason to believe that Ramirez-Solis or Reyes-Martell were lying about his ability to speak English. Trooper Wooding told Officer Smith that he could speak Spanish. Id. at 02:05. This turned out to be an overstatement. Trooper Wooding told Officer Smith to "bring [Ramirez-Solis] back here" so he could speak with him. Id. at 02:15. Officer Smith had Ramirez-Solis step out of the car. -433 at T23:28:17Z. Reyes-Martell said he needed a translator, but he told her that Trooper Wooding spoke Spanish. Id. at T23:28:31Z.

While Trooper Wooding spoke to Ramirez-Solis, Officer Smith moved to the passenger side of the vehicle and questioned Reyes-Martell. She told Officer Smith that she was pregnant and she and Ramirez-Solis were on their way to the hospital. Id. at T23:28:46Z. Officer Smith pointed to the open beer can in the cup holder and asked who had been

---

[1] Because the body-worn camera ("BWC") evidence is divided into several video clips, including multiple clips from the same BWC, video evidence is referenced by BWC, the number in the upper righthand corner of the videos, and the minutes and seconds at which each cited clip starts. For example, the video designated as "Axon Body 2 X81200433" will initially be cited as BWC-X81200433 at T00:39:18Z, and cited subsequently as -433 at T00:39:18Z, regardless of which individual video file the clip is found in. Trooper Wooding's dashboard camera in his cruiser, which was apparently synced with a microphone he was wearing, is cited as "Dash Cam" and is cited using the minutes and seconds from the time signature on the video player, i.e., Dash Cam at 02:05.

2

drinking. Her response is unclear,[2] but Officer Smith asked to see the can and said, "I know you haven't [been drinking]. I'm just making sure he hasn't." Id. at T23:29:09Z. After asking why Ramirez-Solis did not have a license, Officer Smith asked why he was "claiming he can't speak English." Id. at T23:29:56Z. He incorrectly told her that Ramirez-Solis was "talking it pretty good back there to [his] partner." Id.

Meanwhile, Trooper Wooding spoke with Ramirez-Solis on the sidewalk beside the car. He asked him, "¿Como te llamas?" (What is your name?). Dash Cam at 2:50. Ramirez-Solis said his name was "José Ramirez." Id. Trooper Wooding then complimented Ramirez-Solis on his shoes in English. Id. at 3:30. When Ramirez-Solis looked down and said, "thank you," Trooper Wooding responded:

> Let's speak English since you know English. Ok? English. I speak Spanish, you speak Spanish. I speak English and you do, too, because you know what I'm telling you. Ok? You wanna start over and we'll talk English since we know you talk English and you're not gonna get out of it anyway?"

Id. at 3:40. After some back and forth, Ramirez-Solis said, "yo no comprende" (I do not understand). Id. at 3:55. Trooper Wooding responded: "You do 'comprende!' You called me 'bro' and I said I like your shoes and you looked at 'em!" Id. Ramirez-Solis replied, "no English," and Trooper Wooding told him: "Don't bullshit me. No crap—don't bullshit me. Ok? You speak English and I know you do." Id. at 4:05. After struggling to get more details about why Ramirez-Solis was driving without a license, Trooper Wooding told Ramirez-Solis: "You do speak English. Stop! If you want to go to jail then we can keep playing games. If you

---

[2] Reyes-Martell seems to say, "his [unclear] was but I wasn't." -433 at T23:29:05Z.

want to go home today then we'll just do right, ok? Because I know you're full of junk. Ok? You know enough English to talk to me, ok?" Id. at 4:25.

Trooper Wooding then asked, "Where do you live at? Where do you live at? ¿Donde es su casa?" (Where is your house?). Ramirez-Solis said his house was "en Axton." Id. at 4:40. Trooper Wooding asked, "¿que street?"[3] When Ramirez-Solis looked confused, Trooper Wooding responded: "What's the name of the street in Axton? You don't know where you live in Axton?" Id. at 4:53. When Ramirez-Solis still was unable to respond, Trooper Wooding told Ramirez-Solis to "talk to [Officer Smith]." Id. Trooper Wooding told Officer Smith that Ramirez-Solis "knows English" because Ramirez-Solis called him "bro" and looked at his shoes when Trooper Wooding complimented them in English. Id. at 5:05.

Officer Smith picked up where Trooper Wooding left off. He told Ramirez-Solis:

I'm gonna be honest with you, I really don't believe you. Almost every Hispanic person I have ever dealt with has been able to speak English enough that we can communicate. And most of the time they just lie to me and tell me they can't because they think its gonna get them out of something. You understand what I'm saying?

-433 at T:23:31:10Z. Ramirez-Solis shook his head and tried to respond in Spanish, but Officer Smith repeated that he did not believe him. Id. at T23:31:31Z. Officer Smith tried to obtain Ramirez-Solis's address by asking him where someone would send him a letter, but Ramirez-Solis did not understand and apparently thought Officer Smith was asking about an alias. Id. at T23:31:45Z. At that point, about six minutes into the stop, Officer Smith stopped trying to communicate with Ramirez-Solis and called dispatch to run the license tag on the vehicle. Id. at T23:32:39Z. They confirmed that the vehicle belonged to Reyes-Martell. Id. at T:23:34:02Z.

---

[3] The Spanish word for street is "calle."

4

Meanwhile, Trooper Wooding spoke with Reyes-Martell. He told her that Ramirez-Solis understood their conversation since he knew "enough Spanish to communicate." Dash Cam at 5:30–6:05. Trooper Wooding asked Reyes-Martell why Ramirez-Solis was drinking and driving. He also asked whether he was the father of Reyes-Martell's unborn child. He then asked: "Are you trying to get him to kill you and the baby before you ever get to have the kid? Then why would you get in the car with him?" Id. at 6:19. He also offered to call a rescue squad for her. Id. at 7:15. Reyes-Martell told him that her uncle, Corporal Harry Torres, was a Danville police officer and that she had called him on her cell phone. Id. at 7:30. Trooper Wooding then spoke with Corporal Torres on her phone and told him Ramirez-Solis had been "drinking a little bit" and claimed he could not speak English, but he believed Ramirez-Solis was "full of shit." Id. at 7:45. Trooper Wooding shared their location and Corporal Torres said he would come speak with Ramirez-Solis. Id. at 8:20.

Trooper Wooding returned to speak with Ramirez-Solis. He asked, "¿Donde vives?" (Where do you live?). He apparently thought he was asking Ramirez-Solis where he was going. Ramirez-Solis responded, "Axton." -433 at T23:35:21Z. Trooper Wooding then asked, in English, "Where are you going?" Ramirez-Solis looked confused. Trooper Wooding repeated: "¿Donde vives? Where are you going?" Id. at T23:35:36Z. Ramirez-Solis repeated that he lived in Axton and Trooper Wooding replied: "Señor. In Danville. ¿Sí? ¿Donde vives in Danville?" (Sir. In Danville. Yes? Where do you live in Danville?). Ramirez-Solis indicated he did not live in Danville and Trooper Wooding responded, "You're not going to Danville?" Id. at T23:25:43Z. Trooper Wooding then said: "So you're not going to Danville? So [Reyes-Martell is] lying to me?" Id. at T23:35:50Z. Trooper Wooding then returned to his cruiser and

5

Ramirez-Solis asked Officer Smith if he could return to his car, asking, "¿Puedo?" (Can I?), pointing at himself and then at the car. Id. at T23:36:30Z. Officer Smith said, "No, stay here," which Ramirez-Solis understood, likely because "no" is the same word in English and Spanish. Id. Officer Smith responded, "Yeah, you understood that, huh?" Id. at T23:36:36Z. Ramirez-Solis remained calm and respectful throughout the stop.

In the cruiser, Trooper Wooding apparently found some English-to-Spanish translations. When he exited the vehicle, eleven minutes into the stop, he told Ramirez-Solis: "Mi español es poquito, ok? ¿A donde vas en Danville?" (My Spanish is little bit, ok? Where are you going in Danville?). Dash Cam at 11:07. Ramirez-Solis said he was going to his "casa" and Trooper Wooding responded, "[b]ut you say your 'casa' is in Axton?" Id. at 11:20. Ramirez-Solis indicated that they were driving through Danville, -433 at T23:37:20Z, and Trooper Wooding told him he "figured [he] was lying." Id. at T23:37:22Z. Trooper Wooding and Officer Smith conferred and agreed that Reyes-Martell and Ramirez-Solis were telling different stories. Trooper Wooding never admitted he may have misunderstood Ramirez-Solis.

At this point, twelve minutes into the stop, neither Trooper Wooding nor Officer Smith had checked the window tint, investigated whether Ramirez-Solis was intoxicated, or made any efforts to confirm the name he had given them. Instead, Trooper Wooding told Officer Smith that Reyes-Martell's uncle, Corporal Torres, was on the "task force" and was on his way. Dash Cam at 11:48. He added: "I don't know why [Ramirez-Solis] would be, why they're lying. I don't know if they got a load of dope or what." -433 at T23:38:02Z.

Trooper Wooding then called a sergeant to ask him to run Ramirez-Solis's name by a DEA contact to see if Ramirez-Solis was "on [the DEA's] radar." Dash Cam at 17:30. While

6

waiting, 14 minutes into the stop, Trooper Wooding apparently ran a name[4] through the NCIC database, which was returned as "clear." Dash Cam at 13:55. Around the same time, Corporal Torres arrived on the scene. He spoke with Trooper Wooding and explained that, although Reyes-Martell calls him "uncle," she was not actually related to him or his wife. Id. at 14:45. Corporal Torres also relayed that, on his way to the scene, he called his wife and asked her to check Facebook to see who Reyes-Martell's boyfriend was. Id. at 16:40. He showed Trooper Wooding a Facebook profile that appeared to be Ramirez-Solis's, but the profile name did not match the name Ramirez-Solis had given Officer Smith and Trooper Wooding. Id.

While Corporal Torres spoke with Reyes-Martell and Ramirez-Solis, Trooper Wooding called for reinforcements. Trooper Wooding told whoever he was speaking with that he had pulled over a Hispanic man and woman from Axton,[5] they had given "BS" stories,[6] and the officers were trying "to pick their stories apart." Id. at 17:40. When he hung up, Corporal Torres asked Trooper Wooding about a possible odor on Ramirez-Solis. Id. at 18:36. Trooper Wooding then said that he smelled alcohol on Ramirez-Solis's breath, but only "just enough to say he's been drinking." Id. Corporal Torres said that Ramirez-Solis admitted to drinking the beer that was in the car, but the officers did nothing further to finalize a citation.

Instead, Trooper Wooding and Officer Smith next questioned whether they should see if "Phillips would want to do his thing." Id. at T23:46:39Z. Officer Phillips was the drug K-9 handler, and Trooper Wooding and Officer Smith debated whether to have him and his K-9

---

[4] It is unclear what name Trooper Wooding ran through the NCIC system.
[5] At the hearing, Trooper Wooding testified that Mexican drug cartels have a large presence in Axton. Nothing, however, connected Ramirez-Solis or Reyes-Martell to drug or cartel activity.
[6] Trooper Wooding repeatedly said that Ramirez-Solis said they were coming from Greensboro while Reyes-Martell claimed they were coming from Martinsville. Reyes-Martell clearly agreed they were coming from Greensboro and she told Officer Smith they could "prove" they were in Greensboro. -433 at T23:49:45Z.

7

perform a drug sniff on the car. Officer Smith concluded: "We can see. [We] [a]in't got a whole lot for [Officer Phillips] to hang his hat on." Id. at T23:46:45Z. Trooper Wooding also told Officer Smith and two other officers that Ramirez-Solis was wearing a "fanny pack," and said he would "really like to know what's in that." Dash Cam at 22:03; -433 at T23:48:00Z. Another officer suggested he try to get Ramirez-Solis's consent to search. -433 at T23:48:05Z. Twenty-one minutes into the stop, Officer Smith said he would try to get Reyes-Martell's consent to search the car. Id. at T23:48:17Z. Ramirez-Solis continued sitting on the curb.

Officer Smith approached Corporal Torres and told him he was going to try to get Reyes-Martell to consent to a search of the car. Officer Smith then approached Reyes-Martell and, after calling an ambulance for her, told her: "A lot of what y'all are telling us really isn't adding up, ok? We're getting, kinda getting two different stories so we're just trying to figure out what's going on…." Id. at T23:49:34Z. He asked her if anything illegal was in the car. She said no. She also pointed out that, 22 minutes into the stop, the other officer still had her license and registration. Officer Smith assured her they would return them. Corporal Torres then approached the car and asked if Officer Smith had obtained her consent. Officer Smith said he hadn't yet but was working up to that. Id. at T23:50:40Z. Corporal Torres said something to Reyes-Martell, she nodded, and, 23 minutes into the stop, he told Officer Smith to go ahead with the search.

Corporal Torres walked back over to Trooper Wooding and Ramirez-Solis. He told Trooper Wooding that Reyes-Martell had consented to a search of the car. Trooper Wooding asked Corporal Torres to see if Ramirez-Solis would consent to a search of his person. They had Ramirez-Solis stand up and place his hands on his head. Trooper Wooding told Officer

8

Smith to "search him real quick." -433 at T23:51:37Z; Dash Cam at 25:40; BWC-X81159683 at T23:51:33Z. During the search, Ramirez-Solis attempted to lower an arm to open the fanny pack, but Trooper Wooding pushed his arm back up. -683 at T23:31:37Z. Officers found about $1,400 in cash in the fanny pack. Ramirez-Solis explained that his boss paid him via check and he had cashed it. See -683 at T23:51:52Z; -433 at T23:51:51Z; Dash Cam at 26:10. Trooper Wooding asked Ramirez-Solis: "¿Sí or no, dinero en el carro?" (Yes or no, money in the car?). -433 at T23:54:00Z. Trooper Wooding then said "¿Carro? ¿Dinero?" and pointed at the car. Id. Confused, Ramirez-Solis shook his head "no."[7] Id. Corporal Torres then asked Ramirez-Solis in Spanish if there was more money in the car. Ramirez-Solis said there was cash in the glovebox. He explained that the money was payments for other employees. Twenty-eight minutes into the stop, when Corporal Torres asked if there was anything else in the car, Ramirez-Solis said there was an unloaded firearm in the glovebox. -433 at T23:55:35Z. After removing the gun from the glovebox, Officer Smith told an EMT who responded to the scene that Ramirez-Solis was not free to leave. -433 at T23:58:53Z.

The officers then searched the vehicle. In the passenger-side door, Officer Smith found a bottle containing a brown liquid, which Ramirez-Solis said was for a "vape pen." -433 at T00:00:50Z. Officer Smith tested the liquid with a drug field test and detected THC. Id. at T00:09:35Z. As officers continued to search the vehicle, Trooper Wooding said the search needed to be thorough because "the Hispanics [he has] dealt with are really good at hiding [things]." Dash Cam at 49:00. The search did not uncover any other noteworthy items.

---

[7] Trooper Wooding's pronunciation of "carro" may have sounded more like "caro," which means "expensive," potentially causing Ramirez-Solis's confusion. It's also possible and understandable that, despite comprehending the words used, he simply could not tell what Trooper Wooding wanted to know.

About an hour into the stop, Officer Smith retrieved a tint meter and checked the tint on the vehicle's windows, saying "it's time to party." -433 at 59:47. The tint on the back window measured "six," and the front window measured "eighteen." Id. at T00:27:34Z. By this point, officers had put Ramirez-Solis in Trooper Wooding's cruiser. Officer Smith and Corporal Torres joined him in the vehicle, read him his Miranda rights in Spanish, and questioned him about the vape oil and the gun.

One hour and 45 minutes into the stop, Officer Smith told Reyes-Martell the reason for the traffic stop was "the illegal window tint and also for the obstruction of view from the items that you have hanging from the rear-view mirror." -433 at T01:13:37Z. Fifteen minutes later, Officer Smith asked her how long Ramirez-Solis had been in the country illegally and she told him, "[t]hree years." -433 at T01:38:13Z. Ramirez-Solis was ultimately placed under arrest, charged for the possession of the firearm, and cited for the window tint violation.

On December 5, 2019, a grand jury returned an indictment in this court charging Ramirez-Solis with one count of illegal possession of a firearm by an alien who is unlawfully in the country, in violation of 18 U.S.C. § 922(g)(5). ECF No. 14. On August 10, 2020, Ramirez-Solis moved to suppress all evidence uncovered during the search of the car, as well as any statements he made either before or after he was given his Miranda warnings. The court held an evidentiary hearing on September 17, 2020, and this matter is ripe for resolution.

II.

Ramirez-Solis makes several arguments under the Fourth and Fifth Amendments in support of his motion to suppress the physical evidence obtained from the traffic stop, as well as any incriminating statements made during the stop. First, he contends that, even if the stop

10

was initially lawful, it was unlawfully extended, though the government counters that Reyes-Martell's consent to a search of the automobile overrides any Fourth Amendment violation. Next, Ramirez-Solis argues that any statements he made while on the side of the road and before he was given a Miranda warning were made during a custodial interrogation and are therefore inadmissible. Finally, he contends the statements made after he was advised of his rights are not admissible because the Miranda warnings were ineffective under United States v. Seibert, 542 U.S. 600 (2004).

"In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993). "As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." Adkinson, 191 F. Supp. 3d at 568 (internal citations omitted) (citing United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981); United States v. Matlock, 415 U.S. 164, 177–78 n. 14 (1974)).

### III.

A traffic stop implicates vital liberty interests protected by the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "[t]emporary

detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10 (1996). The government need only show a reasonable suspicion "that criminal activity is afoot," the standard for investigative detentions set forth in Terry v. Ohio, 392 U.S. 1, 30 (1968), because a routine traffic stop is "a limited seizure more like an investigative detention than a custodial arrest[,…]to determine the limits of police conduct in routine traffic stops." United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011).

The reasonable suspicion standard is "less demanding . . . than probable cause." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). To justify a Terry stop, a police officer need only point to "specific and articulable facts which, taken together with rational inferences from those facts," Terry, 392 U.S. at 21, evince "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity," Wardlow, 528 U.S. at 124 (quoting Terry, 392 U.S. at 27). This standard is "'considerably less than [a] preponderance of the evidence.'" United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (quoting Wardlow, 528 U.S. at 123).

Under Terry, a traffic stop is reasonable "if (1) the stop was legitimate at its inception, and (2) the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." United States v. Bowman, 884 F.3d 200, 209 (4th Cir. 2018) (internal citations and quotations omitted). A stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Thus, it is vital to consider "whether the police diligently pursued a means of

investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985).

    A.  The Stop Was Initially Justified But Unlawfully Extended

The extension of this traffic stop was clearly unconstitutional. "In this case, even combining all of the factors identified by the government…and viewing them in light of all the other facts and circumstances of this case, we perceive no basis for a reasonable suspicion that [Ramirez-Solis] was involved in criminal activity." U.S. v. Bowman, 884 F.3d 200, 218 (4th Cir. 2018). The court finds that, while the stop of Ramirez-Solis's vehicle was initially justified under the Whren and Terry standards,[8] it was not "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Royer, 460 U.S. at 500. In fact, it went far beyond those limits. Plainly, the officers simply ignored the window tint issue and instead probed for evidence of drugs or other crimes based on unsupported suspicions.

The video shows three key things. First, the officers did not "diligently pursue" the initial grounds for the stop. See Sharpe, 470 U.S. at 675. Second, upon approaching the car, the officers quickly learned that Ramirez-Solis did not have a license to operate a motor vehicle in Virginia, but they did not investigate that in a timely manner. See Va. Code § 46.2-300 (2020). Third, an open container of alcohol was visible in the passenger compartment of the

---

[8] The video shows that the rear window tint of Ramirez-Solis's car was very dark, which gave the officers reasonable suspicion to justify stopping the vehicle. At the time, Virginia law mandated that rear window tint may not "reduce the total light transmittance of such window to less than 35 percent." Va. Code Ann. § 46.2-1052(D)(1). Virginia recently amended the window tint statute to prohibit traffic stops solely on the basis of a suspected window tint violation. See Va. House Bill 5058 (adopted Nov. 9, 2020); 2020 Va. Acts c. 45 (2020). But, at the time of the traffic stop, a suspicion that a vehicle's window tint violated the law could form the basis for a traffic stop. See, e.g., United States v. Brooks, 589 F. Supp. 2d 618, 626 (E.D. Va. 2008). Accordingly, the officers had reasonably suspected that Ramirez-Solis's window tint violated Virginia law. The constitutional problem, however, stems from the fact that the officers did not investigate the basis for the stop—the window tint violation—for nearly an hour.

car, which creates a rebuttable presumption under Virginia law that Ramirez-Solis was drinking while driving, but the officers chose not to investigate that either. See id. § 18.2-323.1(B).

Instead, the traffic stop turned into an investigation into Ramirez-Solis's ability to speak English and his involvement with drugs, perhaps through a Mexican cartel. The officers had no reason to suspect that drugs were in the car other than their conjecture. They did not observe any drug paraphernalia. They did not smell anything to suggest the presence of drugs. They did not have a tip that drugs were being transported in that car, or any car on that road for that matter. They had no cause to suspect that either Ramirez-Solis or Reyes-Martell were involved in drug trafficking. They merely believed that Ramirez was lying about his inability to speak English and that the he and Reyes-Martell gave "inconsistent" answers. But any inconsistency was likely caused by Trooper Smith's falsely advertised ability to speak Spanish.

To be clear, pursuit of other investigations during a traffic stop is not per se unconstitutional. "[D]uring the course of a traffic stop, officers may question motorists about matters unrelated to its original justification as long as the questioning 'occurs within the timeframe reasonably necessary to effectuate the traffic stop.'" United States v. Davis, 460 F. App'x 226, 230 (4th Cir. 2011) (quoting United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010)). "[W]here a delay can be characterized as de minimis under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation." United States v. Digiovanni, 650 F.3d 498, 509 (4th Cir. 2011) (citing United States v. Mason, 628 F.3d at 132). Courts must consider the officers' diligence in investigating the original, justified purpose of the stop. "The Fourth Amendment permits an officer to conduct an investigation unrelated to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.'"

Bowman, 884 F.3d at 210 (citing Rodriguez v. United States, 575 U.S. 348, 349 (2015)) (emphasis in original). If "the totality of the circumstances, viewed objectively, establishes that the officer[s], without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak of a lack of diligence." United States v. Everett, 601 F.3d 484, 495 (6th Cir. 2010).

Here, the officers ignored the reason for the stop for nearly an hour and held Ramirez-Solis on the side of the road for two hours to pursue their unsubstantiated conjecture that he was involved in drug trafficking. The officers' assumptions, fed by confusion caused by their own limited Spanish, do not reasonably support their suspicion that Ramirez-Solis was involved in a drug or cartel activity. Trooper Wooding and Officer Smith had nothing more than an "inchoate and unparticularized suspicion or hunch" to justify extending the traffic stop as they did. Terry, 392 U.S. at 27. "[E]ven if the totality of the circumstances here could have been viewed as vaguely suspicious, the government has failed to articulate why [Ramirez-Solis]'s 'behavior is likely to be indicative of some more sinister activity than may appear at first glance.'" Bowman, 884 F.3d at 218–19 (4th Cir. 2018) (citing United States v. Williams, 808 F.3d 238, 251 (4th Cir. 2015)).

In the absence of reasonable suspicion, the extension of the traffic stop to investigate drug trafficking was without basis, it violated the Fourth Amendment, and any evidence obtained during the unreasonable investigation must be suppressed. See Weeks v United States, 232 U.S. 383, 398 (1914) (establishing exclusion of evidence as the remedy for a Fourth Amendment violation); Mapp v. Ohio, 367 U.S. 643, 657 (1961) ("[T]he exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments . . . ."). The court need not

determine when the traffic stop should have ended since the officers ignored the window tint investigation in favor of an unsupported drug investigation almost immediately.[9]

### B. Reyes-Martell's Consent Is Not Sufficiently Attenuated from the Unlawful Seizure

The government contends that Reyes-Martell's consent to a search of the automobile overrides the Fourth Amendment violation. Under some circumstances, a defendant's voluntary consent can cure an otherwise unlawful search and seizure. See Brown v. Illinois, 422 U.S. 590, 603–04 (1975); United States v. Seidman, 156 F.3d 542, 549–50 (4th Cir. 1998). "Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent." United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). "When a consensual search is preceded by a Fourth Amendment violation, the government must prove not only the voluntariness of the consent under the totality of the circumstances, but also must 'establish a break in the causal connection between the illegality and the evidence thereby obtained' so that the consent cannot be considered an exploitation of the illegal act." United States v. Burke, 605 F. Supp. 2d 688, 693 (D. Md. 2009) (quoting United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir. 1994)). "Thus, if relying on consent to justify a search or seizure, 'the government has a heavier burden to carry when the consent follows an illegal stop.'" Id. (quoting Melendez, 28 F.3d at 1054).

Reyes-Martell consented[10] to the search of the car over 20 minutes into the traffic stop, well before the officers began to investigate the reason for the stop—the window tint

---

[9] Had one of the officers been diligently pursuing an investigation into the window tint, the open container, or Ramirez-Solis's lack of a license while another questioned Ramirez-Solis and Reyes-Martell on unrelated matters, this would be a different case.

[10] Although Ramirez-Solis did not consent to the search of the car, its owner, Reyes-Martell, did. "Searches undertaken with the consent of one with dominion over the property are a well-recognized exception to the warrant requirements of the Fourth Amendment." United States v. Carter, 569 F.2d 801, 803 (4th Cir. 1977).

16

violation. Had the officers not unlawfully extended the stop, they would not have had the chance to extensively question her and secure her consent. The court finds her consent was an "exploitation" of the prior Fourth Amendment violation. See Burke, 605 F. Supp. 2d at 693. Thus, it must be disregarded as "fruit of the poisonous tree." See United States v. Lentz, 524 F.3d 501, 522 (4th Cir. 2008) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

"[I]f the government has committed a constitutional violation, evidence obtained as a result of the violation cannot be used unless the connection between the unlawful conduct and the acquisition of the evidence has become so attenuated as to dissipate the taint" of the violation. Id. at 697. The government has not shown that Reyes-Martell's consent was an "act of free will" that is sufficient to "purge the primary taint of the unlawful invasion." Wong Sun v. United States, 371 U.S. 471, 486 (1963). Here, the consent to search cannot be divorced from the unconstitutionally protracted stop. Rather, it follows from the repeated questioning of both Ramirez-Solis and Reyes-Martell about issues unrelated to the stop. Although Reyes-Martell indicated that she was pregnant and was on the way to the hospital, the officer made clear that, while she could be taken to the hospital by EMS personnel, Ramirez-Solis and the car would remain there. Based on these circumstances, the court is not persuaded that Reyes-Martell's consent was so attenuated as to be unaffected by the constitutional violation that

---

"Here, the consent was not given by the defendant but 'when the prosecution seeks to justify a warrantless search by proof of a voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or sufficient relationship to the premises or effects sought to be inspected.'" Id. (quoting United States v. Matlock, 415 U.S. 124, 171 (1973)). Defendant Ramirez-Solis was the vehicle's driver, but Reyes-Martell was its owner and a passenger. As the lawful owner of the car, she had the authority to consent to the search. See Arthur J. Park, Automobile Consent Searches: The Driver's Options in a Lose-Lose Situation, 14 Rich. J.L. & Pub. Int. 461, 470–71 (2011) (noting that the "owner or driver of the automobile" may validly consent to its search).

preceded it. Accordingly, her consent did not cure it of the officers' Fourth Amendment violation and cannot justify the search of the automobile.

IV.

When a defendant is in custody and subject to interrogation, he must be advised of his Fifth Amendment rights pursuant to Miranda. Id. "[U]nless a defendant is advised of his Fifth Amendment rights…and voluntarily waives them, statements he makes during a custodial interrogation must be suppressed." Id. "When determining whether an interrogation is custodial for purposes of Miranda, a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest." Id. at 325–26 (internal quotation marks omitted). This objective inquiry asks whether a reasonable person would have felt he could terminate the interrogation and leave. Id. at 326.

    A.  Ramirez-Solis's Pre-Miranda Statements Were Unlawfully Obtained

Ramirez-Solis contends his statements to the police regarding the gun discovered in the glove box should be suppressed because his questioning violated the Fifth Amendment. Specifically, he contends his conversation with the police on the side of the road was a custodial interrogation and he was not advised of his Miranda rights at the time. The court agrees. See United States v. Azua-Rinconada, 914 F.3d 319, 325 (4th Cir. 2019).

Ramirez-Solis was subject to a custodial interrogation[11] on the side of the road. The officers told him to step out of the car and that he might go to jail if he did not speak to them in English. He was surrounded by multiple officers who were directing his movements. Most

---

[11] The government concedes Ramirez-Solis was interrogated during the stop, as the officers intended to elicit incriminating information. See Rhode Island v. Innis, 446 U.S. 291, 301–02 (1980). It does not concede that he was in custody.

18

importantly, Officer Smith told Ramirez-Solis he was not free to leave when he asked if he could return to his car. See -433 at T23:36:30Z. These restrictions of his movement show he was in police custody. Because the police failed to advise him of his rights before interrogating him while in their custody, his pre-Miranda statements must be suppressed.

B. Ramirez-Solis's Post-Miranda Statements Are Part of the Unlawful Seizure

The government counters that, even if Ramirez-Solis's pre-Miranda statements are suppressed, his post-Miranda statements are admissible. But, even if Ramirez-Solis's Fifth Amendment rights were not violated during questioning in the cruiser, "the Fourth Amendment issue remains." Brown, 422 U.S. at 601–02. "If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." Id.; see also Davis v. Mississippi, 394 U.S. 721, 726–27 (1969).

To determine whether the fruit of a poisonous tree is no longer poisonous, "a direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissible." United States v. Najjar, 300 F.3d 466, 477 (4th Cir. 2002). The court also considers several other factors, "including: 1) the amount of time between the illegal action and the acquisition of the evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." Id. Ultimately, what suffices to cure the tarnished evidence "depends on the specific facts and circumstances of each case and therefore, is particularly amenable to resolution by the district court." Id.; see also United States v. Ceccolini, 435 U.S. 268, 276 (1978) (noting that there is no "'per se' or 'but for' rule

that would make inadmissible any evidence…which somehow came to light through a chain of causation that began with [the constitutional violation]").

Here, all factors weigh in Ramirez-Solis's favor and compel the court to conclude that his statements on the side of the road and in the cruiser, regardless of when he was advised of his Miranda rights, are the product of the officers' "exploitation" of the illegal seizure. First, Ramirez-Solis was held on the side of the road by multiple officers for 28 minutes before he made the statements in question. Second, nothing intervened and broke the causal chain between his unlawful detention and his statements. Rather, between the initial stop and Ramirez-Solis's statements, the officers searched high and low for reasons to support their suspicion of drug activity by attempting to run Ramirez-Solis's name by a DEA contact, calling Officer Phillips to "do his thing," and using miscommunications to make it seem like Ramirez-Solis and Reyes-Martell were telling different and, thus, suspicious stories. Moreover, Ramirez-Solis's statements in the cruiser were preceded by an illegal car search. For these reasons, Ramirez-Solis's statements cannot be used against him in a court of law and will be suppressed.

V.

Ramirez-Solis was held on the side of the road for a protracted period to pursue a drug investigation that lacked factual support or constitutional justification. Accordingly, the court will **GRANT** his motion to suppress. An appropriate order will issue.

It is so **ORDERED**.

Entered: January 19, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.01.19 11:27:10 -05'00'

Hon. Michael F. Urbanski
Chief United States District Judge